JAMES F. CLAPP (145814)
jclapp@clapplegal.com
MARITA MURPHY LAUINGER (199242)
mlauinger@clapplegal.com
CLAPP & LAUINGER LLP
701 Palomar Airport Road, Suite 300
Carlsbad, California 92011
Tel:  760-209-6565 ext. 101
Fax: 760-209-6565

EDWARD J. WYNNE (165819)
ewynne@wynnelawfirm.com
WYNNE LAW FIRM
80 E. Sir Francis Drake Blvd., Ste. 3-G
Larkspur, CA 94939
Tel: (415) 461-6400
Fax: (415) 461-3900

Attorneys for Plaintiff
DONALD HATCH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD HATCH, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>      v.<br><br>STIIIZY, INC., a Delaware corporation, CV WELLNESS, LLC dba AUTHENTIC 209,<br><br>            Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>1.  Negligence<br>2.  Unjust Enrichment<br>3.  Breach of Implied Contract<br>4.  Violation of Cal. Confidentiality of Medical Information Act<br>5.  Violation of Cal. Consumer Privacy Act<br>6.  Violation of Cal. Bus. & Prof. Code section 17200 et seq. |

1

Plaintiff Donald Hatch ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendants Stiiizy, Inc. and CV Wellness, LLC dba Authentic 209 ("Defendants"):

## INTRODUCTION

1.    The release, disclosure, and publication of sensitive, personal information can be devastating. Not only is it an intrusion of privacy, but it is a harbinger of identity theft.

2.    This class action arises out of a recent targeted cyberattack and data breach where unauthorized third-party criminals stole the highly sensitive personal information of Plaintiff and approximately 380,000 similarly situated customers of Defendants (the "Data Breach").

3.    The personal information obtained during the Data Breach includes name, address, date of birth, age, drivers' license number, passport number, photograph, the signatures appearing on a government ID card, medical cannabis cards, transaction histories, and other personal information contained therein (collectively, "PII").

4.    Defendants are a cannabis brand and lifestyle company known for innovative products and premium-quality cannabis offerings.[1]  During the regular course of conducting its business, Defendants collect, store, and transfer the PII of its customers (collectively the "Class Members").

5.    On or about November 20, 2024, Defendants identified suspicious activity on its computer system.[2]  After engaging computer forensic specialists, Defendants learned that unauthorized third parties had accessed PII entrusted to Defendants on or around October 10, 2024 - November 10, 2024.

6.    Despite knowing of the Data Breach since November 2024, Defendants did not begin to send a Notice of Data Security Incident ("Notice")

---

[1] https://www.stiiizy.com/pages/company-vision
[2] https://oag.ca.gov/ecrime/databreach/reports/sb24-597121

CLASS ACTION COMPLAINT

to individuals affected by the Data Breach until January 8, 2025.  Plaintiff's Notice was dated January 16, 2025, and he did not receive the Notice until that date, well over three months after the Data Breach first occurred.

7.      In its Notice, Defendants failed to provide important details about the Data Breach, including whether the cybercriminal(s) responsible for the breach were identified or the information exfiltrated was held for ransom. Defendants also did not disclose whether its investigation detected compromised information on the dark web. Defendants simply offered credit monitoring and identity restoration services to affected individuals, but this offer is woefully inadequate, as it does not make Plaintiff and the Class Members whole for the harms caused by the Data Breach, nor does it protect them against the indefinite risk of harm caused by disclosure of their PII.

8.      Defendants' Notice also did not disclose how it discovered the Data Breach, the means and mechanism of the cyberattack, and, importantly, what specific steps Defendants took following the Data Breach to secure its systems and prevent future cyberattacks.

9.      Because cyberattacks targeting large corporations are ubiquitous, it was foreseeable that Defendants would be the target of a cyberattack, and they should have taken appropriate precautions.

10.     The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect PII from the foreseeable threat of a cyberattack.

11.     By being entrusted with Plaintiff's and the Class Members' PII for its own pecuniary benefit, Defendants assumed a duty to Plaintiff and the Class Members to implement and maintain reasonable and adequate security measures to protect Plaintiff's and the Class Members' PII against unauthorized access and disclosure. Defendants also had a duty to adequately safeguard this PII under applicable law, as well as pursuant to industry standards and duties

CLASS ACTION COMPLAINT

imposed by statutes, including Section 5 of the Federal Trade Commission Act ("FTC Act"). Defendants breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices.

12.     Cybercriminals can use and sell stolen PII to further harm Plaintiff and the Class Members in a variety of ways, including: destroying their credit by opening new financial accounts and taking out loans in Class Members' names; using Class Members' names to improperly obtain medical services; using Class Members' PII to target other phishing and hacking intrusions; using Class Members' PII to obtain government benefits; and otherwise assuming Class Members' identities.

13.     Defendants' failure to notify the victims of its Data Breach in a timely manner meant that Plaintiff and the Class Members were unable to take quick action to prevent or mitigate the resulting harm.

14.     Despite having been accessed and "acquired" by unauthorized criminal actors, Plaintiff's and the Class Members' sensitive and confidential PII remains in Defendants' possession. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

15.     As a result of the Data Breach, Plaintiff and approximately 380,000 Class Members have suffered concrete harm and are now exposed to a heightened and imminent risk of fraud and identity theft for a period of years, if not decades. Furthermore, Plaintiff and the Class Members must now and in the future closely monitor their financial accounts to guard against identity theft, at their own expense. Consequently, Plaintiff and the Class Members will incur ongoing out-of-pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

CLASS ACTION COMPLAINT

16.     Plaintiff and the Class Members also will be forced to expend additional time to review credit reports and monitor their financial accounts for fraud or identity theft. Moreover, because the exposed information includes social security numbers, the risk of identity theft and fraud will persist throughout their lives.

17.     Plaintiff and the Class Members seek to hold Defendants responsible for the harms caused by the Data Breach. Plaintiff seeks remedies for Defendants' negligence, unjust enrichment, breaches of implied contract, and violations of state consumer protection statutes as alleged herein.

## PARTIES

### Plaintiff Donald Hatch

18.     Plaintiff Donald Hatch is an individual residing in the State of California.

19.     Plaintiff entrusted his PII to Defendants in connection with his purchase of products from Defendants.  Plaintiff was a customer of the Stiiizy location on 1528 Webster Ave., Alameda, CA listed in the Notice.

20.     On January 16, 2025, Plaintiff received a Notice from Defendants by email.

21.     Plaintiff is careful about sharing his PII and takes reasonable steps to protect it.  Plaintiff has never knowingly transmitted unencrypted PII over the internet or through other unsecured means.

22.     At the time of the Data Breach, Defendants had Plaintiff's PII in its systems, and on information and belief they continue to retain that information.

23.     Since receiving the Notice, Plaintiff made reasonable efforts to mitigate its impact, including, but not limited to, monitoring his various financial and banking accounts for fraudulent activity.

24.     Plaintiff has suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to:

5

(a) damage to and diminution in the value of Plaintiff's confidential PII, a form of property that was entrusted to Defendants and was compromised as a result of the Data Breach Defendants failed to prevent; and (b) a violation of Plaintiff's privacy rights as a result of unauthorized disclosure of his PII.

25.    Plaintiff has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because Defendants disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

26.    Plaintiff is exposed, and will continue to be exposed for the remainder of his life, to imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

27.    Plaintiff is also at a continued risk of harm because, on information and belief, his PII remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack, so long as Defendants fail to undertake the necessary and appropriate data security measures to protect the PII in its possession.

28.    Plaintiff has a continuing interest in ensuring that his PII, which remains within Defendants' possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

**Defendants**

29.    Defendant Stiiizy, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

30.    Defendant CV Wellness, LLC dba as Authentic 209 a California limited liability company.  Plaintiff alleges on information and belief that its principal place of business is in Los Angeles, California.

6

**JURISDICTION AND VENUE**

31.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2) because: (i) the amount in controversy exceeds $5 million, exclusive of interest and costs; (ii) the number of Class Members exceeds 100; and (iii) minimal diversity exists because many Class Members, including Plaintiff, have different citizenship from Defendant.

32.    With regard to diversity of citizenship, on January 9, 2025, Stiiizy filed a notice of data breach with the Maine Attorney General.  According to that notice, a total of 380,000 persons were affected by the present breach, including 212 residents of Maine.  Similarly, on December 23, 2024, Stiiizy filed a notice of data breach with the Texas Attorney General, disclosing that 11,000 Texans were affected by the breach.  These notices demonstrate that the citizenship of many class members is different from the citizenship of Defendants, thereby satisfying CAFA jurisdiction.

33.    Venue is proper under 28 U.S.C. § 1391(a) and (b) because Defendants' principal place of business is in this District and a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District.

**GENERAL ALLEGATIONS**

**Overview of Defendants and Their Collection of PII**

34.    Defendants describe themselves as a company that "uses cutting-edge technology to deliver unparalleled products and services to our customers."[3]  Defendants sell cannabis and cannabis-related products.

35.    As a regular and necessary part of their business, Defendants collect and maintain sensitive PII from its customers. That information includes, but is not limited to, names, addresses, dates of birth, social security

---

[3] https://www.stiiizy.com/pages/company-vision

CLASS ACTION COMPLAINT

numbers, medical information, drivers' license number, passport number, photograph, the signatures appearing on a government ID card, medical cannabis cards, transaction histories, and other personal information. Defendants are and were aware of the sensitive nature of the PII they collect, and they acknowledge the importance of data privacy. Indeed, in its Privacy Policy on its website, Defendants claim that they "implement(s) security measures designed to protect your information from unauthorized access, disclosure or accidental loss or destruction."[4]

36.    The Privacy Policy goes on to state: "[W]e utilize appropriate physical, technical and managerial safeguards designed to protect the information we collect."[5]

37.    Upon information and belief, Defendants promise their customers, including Plaintiff and the Class Members, to keep PII private; comply with FTC guidelines; inform consumers of its legal duties and comply with all federal and state laws protecting consumer PII; only use and release PII for reasons that relate to the products and services Plaintiff and the Class Members obtain from Defendants; and provide adequate notice to individuals if their PII is disclosed without authorization. Based on those promises, Plaintiff and the Class Members reasonably expected that Defendants would do these things.

38.    By obtaining, collecting, using, and benefitting from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties that required them to, at a minimum, implement adequate safeguards to prevent unauthorized use or disclosure of PII and to report any unauthorized use or disclosure of PII.

39.    Contrary to Defendants' representations and assurances, it failed to implement adequate data security measures, as evidenced by the Data Breach.

---

[4] https://www.stiiizy.com/policies/privacy-policy
[5] https://www.stiiizy.com/policies/privacy-policy

CLASS ACTION COMPLAINT

**The Data Breach**

40.    In the data breach notification filed with the California Attorney General, Defendants disclosed that they became aware of the Data Breach on November 20, 2024.

41.    Defendant did not begin sending Plaintiff and other Class Members the Notice until approximately January 8, 2025.

42.    Omitted from the Notice was information explaining the cause of the Data Breach or the vulnerabilities exploited by the cybercriminals. To date, these omitted details have not been explained or revealed to Plaintiff and the Class Members, who retain a vested interest in ensuring that their PII is not repeatedly exposed to cybercriminals by Defendants.

43.    Defendants' Notice also omits what computer systems were impacted, the means and mechanisms of the cyberattack, how it determined that the PII had been accessed, and (of particular importance to Plaintiff and the Class Members) the actual steps Defendants took following the Data Breach to secure its systems and train its employees to prevent further cyberattacks.

44.    Based on Defendants' acknowledgments, it is evident that unauthorized criminal actors did in fact access and exfiltrate the Class Members' PII.

45.    The PII contained in the files accessed by cybercriminals appears not to have been encrypted because if properly encrypted, the attackers would have acquired unintelligible data and would not have accessed Plaintiff's and Class Members' PII.

46.    As an entity that collects and maintains significant volumes of PII, the targeted attack was a foreseeable risk of which Defendants were aware and knew it had a duty to guard against.

47.    The Data Breach reportedly impacted the PII of approximately 380,000 individuals.

9

CLASS ACTION COMPLAINT

## Defendants Failed to Follow FTC Guidelines

48.     The Federal Trade Commission ("FTC") has regularly promulgated guidelines for businesses, which highlight the necessity of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision- making.

49.     Defendants were prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.[6]

50.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[7]

51.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

---

[6] See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

[7] Protecting Personal Information: A Guide for Business, FEDERAL TRADE COMMISSION (October 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting- personal-information.pdf.

CLASS ACTION COMPLAINT

52.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

53.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.[8]  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

54.    Defendants failed to properly implement the basic data security practices recommended by the FTC.

55.    Defendants were at all times fully aware of their obligation to protect their customers' PII. Defendants were also aware of the significant repercussions that would result from their failure to do so.  Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

**Defendants Failed to Comply with Industry Standards**

56.    In light of the evident threat of cyberattacks seeking consumers'

---

[8] *See, e.g. In the Matter of LabMD, Inc., A Corp*, No. 9357, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act."), *vacated on other grounds, LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221 (11th Cir. 2018).

CLASS ACTION COMPLAINT

PII, several best practices have been identified by regulatory agencies and experts that, at a minimum, should be implemented by companies like Defendants to secure Plaintiff's and Class Members' PII.

57.    Defendants are aware of the importance of safeguarding Plaintiff's and Class Members' PII, and that by virtue of its business—as a company that handles sensitive personal, financial and in some cases health information—it placed Plaintiff's and Class Members' PII at risk of being targeted by cybercriminals.

58.    Because Defendants failed to implement, maintain, and comply with necessary cybersecurity requirements, it was unable to protect Plaintiff's and Class Members' information and confidentiality, and protect against obvious and readily foreseeable threats to information security and confidentiality.

59.    Several best practices have been identified that, at a minimum, should be implemented by corporate entities like Defendants, including, but not limited to: educating all employees; strong passwords; multi-layer security, such as firewalls and anti-virus and anti- malware software; encryption (e.g., making data unreadable without a key); multi-factor authentication; backup data; and limiting the number of employees with access to sensitive data.

60.    Other commonly accepted data security standards among businesses that store personal information, such as the PII involved here, include, but are not limited to:

- Maintaining a secure firewall configuration;
- Monitoring for suspicious or irregular traffic to servers;
- Monitoring for suspicious credentials used to access servers;
- Monitoring for suspicious or irregular activity by known users;
- Monitoring for suspicious or unknown users;
- Monitoring for suspicious or irregular server requests;

12

- Monitoring for server requests for personal and financial information;

61.    Defendants failed to meet the minimum standards of, e.g., the NIST Cybersecurity Framework, and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established industry standards in reasonable cybersecurity readiness.

62.    These foregoing frameworks are existing and applicable industry standards in the corporate sector and Defendants failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

63.    Despite Defendants' obligations, Defendants failed to appropriately monitor and maintain its data security systems in a meaningful way so as to prevent the Data Breach.

64.    Had Defendants properly maintained their systems and adequately protected them, they could have prevented the Data Breach.

**Defendants Breached Their Duty to Safeguard PII**

65.    Defendants were aware of the importance of security in maintaining PII and the value consumers place on keeping their PII secure.

66.    In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and the Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Plaintiff and the Class Members.

13

67.    Defendants owed a duty to Plaintiff and the Class Members, who entrusted Defendants with extremely sensitive PII to design, maintain, and test the information technology systems that housed Plaintiff's and Class Members' PII, to ensure that the PII in Defendants' possession were adequately secured and protected.

68.    Defendants owed a duty to Plaintiff and the Class Members to adequately train its employees and others with access to Plaintiff's and Class Members' PII on the procedures and practices necessary to safeguard such sensitive information. This duty also required supervision, training, and compliance on Defendants' part to ensure that it complied with creating, implementing, and maintaining reasonable data security practices and procedures sufficient to protect Plaintiff's and Class Members' PII.

69.    Defendants owed a duty to Plaintiff and the Class Members to implement processes that would enable Defendants to timely detect a breach of their information technology systems, and a duty to act upon any data security warnings or red flags detected by such systems in a timely fashion.

70.    Defendants owed a duty to Plaintiff and the Class Members to disclose when and if their information technology systems and data security practices were not adequate to protect and safeguard Plaintiff's and Class Members' PII.

71.    Defendants owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of inadequate data security practices.

72.    Defendants violated these duties. Defendants became aware of the Data Breach on or about November 20, 2024; however, Plaintiff, Class Members, and the public did not learn of the Data Breach until two to three months later. Defendants failed to publicly describe the full extent of the Data Breach and notify the affected parties. This demonstrates that Defendants did

14

not properly implement measures designed to timely detect a data breach of their information technology systems, as required to adequately safeguard Plaintiff's and Class Members' PII.

73.     Defendants breached its obligations to Plaintiff and the Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;
- Failing to adequately protect customers' PII;
- Failing to ensure that its vendors with access to PII employed reasonable security procedures;
- Failing to train its vendors and employees in the proper protection of PII;
- Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;
- Failing to adhere to industry standards for cybersecurity as discussed above; and
- Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' private PII.

74.     Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cybercriminals to access their computer network, which contained unsecured and unencrypted PII.

75.     Had Defendants remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into its information storage and security systems and, ultimately, the

15

theft of Plaintiff's and Class Members' confidential PII.

76.     However, due to Defendants' failures, Plaintiff and the Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Defendants.

### The Data Breach Was Foreseeable

77.     The Data Breach was foreseeable and avoidable.

78.     Various governmental bodies have put entities like Defendants on notice of the likelihood of cyberattacks. In a Joint Cybersecurity Advisor, the Federal Bureau of Investigation ("FBI") and the Cybersecurity & Infrastructure Security Agency ("CISA") encouraged critical infrastructure organizations, such as Defendants, to implement their various recommendations as set forth in the advisory to reduce the likelihood and impact of inevitable ransomware and data extortion efforts, including against similar ransomware attacks perpetrated by similar ransomware gangs.[9]

79.     Indeed, cyberattacks have been common for over ten years, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[10]

---

[9] *See, e.g, #StopRansomware: ALPHV Blackcat*, AMERICA'S CYBER DEFENSE AGENCY (Feb. 27, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-353a; *#StopRansomware: ALPHV Blackcat*, AMERICA'S CYBER DEFENSE AGENCY (May 10, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-131a.

[10] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI(Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

80.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[11]

81.    The Office for Civil Rights ("OCR") also urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[12]

82.    Moreover, in light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

83.    Data breaches are preventable. As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches

---

[11] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.
[12] Stolen Laptops Lead to Important HIPAA Settlements, U.S. Department of Health and Human Services (Apr. 22, 2014), https://wayback.archiveit.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

CLASS ACTION COMPLAINT

that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised…"  and "[m]ost of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … [a]ppropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [13]

84.     Given the wealth of information from law enforcement concerning the increasing prevalence of cyberattacks, Defendants knew and should have known about their data security vulnerabilities and implemented enhanced and adequate protection to protect and secure Plaintiff's and Class Members' Private Information. Even knowing the risk, Defendants failed to do so.

85.     Defendants were well aware that the protected PII it acquires, stores, and utilizes is highly sensitive and of significant value to both the owners of the PII and those who would use it for wrongful purposes.

86.     Defendants knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

87.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and the Class Members from being compromised.

---

[13] Lucy L. Thompson, Data Breach and Encryption Handbook (2011) https://archive.org/details/isbn_9781604429893/page/28/mode/2up.

CLASS ACTION COMPLAINT

88.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and the Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and the Class Members as a result of a breach.

89.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' servers, amounting to potentially hundreds of thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

90.    As a sophisticated party that handles sensitive PII, Defendants failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff's and other Class Members' PII to protect against anticipated threats of intrusion of such information.

91.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII preceding the date of the breach.

**PII Is Inherently Valuable**

92.    PII is a valuable property right.[14]  The value of PII as a commodity is measurable.[15]  "Firms are now able to attain significant market valuations by

---

[14] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible..."), https://www.researchgate.net/publication/283668023.

[15] Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

CLASS ACTION COMPLAINT

employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[16]  American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[17]  Personal data is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

93.     PII can sell for as much as $363 per record according to the Infosec Institute.[18]  PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

94.     PII is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers. Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value." The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information on anonymous websites, making the information widely available to the criminal underworld.

---

[16] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220 at 4, OECD Publishing (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[17] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[18] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

20

95.    There is an active and robust market for this information. As John Sancenito, president of Information Network Associates, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

96.    As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, driver's license numbers, other ID numbers, Social Security numbers, PII, and other sensitive information directly on various websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

97.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[19]

### Plaintiff and the Class Members Suffered Harm

98.    Identity theft is the most common consequence of a data breach—it occurs to 65% of data breach victims.[20]  Consumers lost more than $56 billion to identity theft and fraud in 2020, and over 75% of identity theft victims

---

[19] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

[20] Eugene Bekker, *What Are Your Odds of Getting Your Identity Stolen?*, IDENTITYFORCE BLOG (Apr. 14, 2021), https://www.identityforce.com/blog/identity-theft-odds-identity-theft-statistics.

reported emotional distress.[21]

99.    Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[22]

100.    Identity thieves use PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

101.    With access to an individual's PII, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, obtaining government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[23]

102.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[24]

---

[21] *Id.*

[22] Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER ADVICE, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft

[23] *Warning Signs of Identity Theft*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Sept. 5, 2024).

[24] U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

22

103.   That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims and take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique known as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

104.   PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use the information and trade it on dark web black-markets for years to come.

105.   For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

106.   The PII exposed in the Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly impending and substantial.

107.   Theft of drivers' license numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced.

CLASS ACTION COMPLAINT

108.   Due to their highly sensitive nature, theft of drivers' license numbers in combination with other PII (e.g., name, address, date of birth) can result in a variety of fraudulent activity.

109.   There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected for weeks or months.

110.   According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

111.   A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:



112.   It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for improper purposes and

---

[25] Id.

CLASS ACTION COMPLAINT

scams, including making the information available for sale on the black market.

113.   Victims of the Data Breach, like Plaintiff and the Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[26]  The Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

114.   As a result of Defendants' conduct and failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' PII, which allowed the Data Breach to occur, Plaintiff's and Class Members' PII has been and is now in the hands of unauthorized individuals and third parties, which may include thieves, unknown criminals, and other potentially hostile individuals.

115.   Plaintiff and the Class Members greatly value their privacy, especially their PII. They would not have entrusted Defendants with their PII had they known that it would fail to adequately protect it. Indeed, Plaintiff and the Class Members provided Defendants with this highly sensitive information with the expectation that Defendants would keep their PII secure and inaccessible from unauthorized parties.

116.   As a result of Defendants' failure to implement and follow even the most basic security procedures, Plaintiff and the Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including, but not limited to the following:

- Trespass, damage to, and theft of their personal property, including PII;

---

[26] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION (Sept. 2013), http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

CLASS ACTION COMPLAINT

- Improper disclosure of their PII;
- The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their PII being in the hands of criminals and having already been misused;
- The imminent and certainly impending risk of having their confidential PII used against them by spam callers to defraud them;
- Damages flowing from Defendants' untimely and inadequate notification of the Data Breach;
- Loss of privacy suffered as a result of the Data Breach;
- Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;
- Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' PII for which there is a well-established and quantifiable national and international market;
- The loss of use of and access to their credit, accounts, and/or funds;
- Damage to their credit due to fraudulent use of their PII; and
- Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

117.  Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and the Class Members will need to maintain these heightened measures for years, and possibly their entire lives.

118.  Plaintiff and the Class Members are also at a continued risk of harm because their PII remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendants fails to undertake the necessary and appropriate

26

data security measures to protect the PII in its possession.

119.   Plaintiff and the Class Members further face substantial risk of being targeted for phishing, data intrusion, and other illegal schemes based on Plaintiff's and Class Members' PII, as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and the Class Members.

120.   Plaintiff and the Class Members further have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of- pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

- Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;
- Purchasing credit monitoring and identity theft prevention;
- Placing "freezes" and "alerts" with reporting agencies;
- Spending time on the phone with or at financial institutions and/or government agencies to dispute unauthorized and fraudulent activity in their names;
- Contacting financial institutions and closing or modifying financial accounts; and
- Closely reviewing and monitoring insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

121.   As a result of the Data Breach, and in addition to the time Plaintiff and the Class Members have spent and anticipate spending to mitigate the impact of the Data Breach on their lives, Plaintiff and the Class Members have also suffered emotional distress from the public release of their PII, which they

27

believed would be protected from unauthorized access and disclosure. The emotional distress they have experienced includes anxiety and stress resulting from the fear that unauthorized bad actors are viewing, selling, and or using their PII for the purposes of identity theft and fraud.

122.    Additionally, Plaintiff and the Class Members have suffered damage to and diminution in the value of their highly sensitive and confidential PII, a form of property that Plaintiff and the Class Members entrusted to Defendants, and which was compromised as a result of the Data Breach Defendants failed to prevent. Plaintiff and the Class Members have also suffered a violation of their privacy rights as a result of Defendants' unauthorized disclosure of their PII.

123.    Plaintiff and the Class Members were also damaged because they overpaid for products that should have been accompanied by adequate data security but was not. Part of the price Plaintiff and the Class Members paid to Defendants was intended to be used by Defendants to fund adequate security of their computer system(s) and Plaintiff's and Class Members' PII. Thus, Plaintiff and the Class Members did not get what they paid for and agreed to.

124.    To date, Defendants have done virtually nothing to provide Plaintiff and the Class Members with relief for the damages they have suffered as a result of the Data Breach. Defendants offered credit monitoring, but did not disclose how it determined eligibility. Not only did Defendants fail to provide adequate ongoing credit monitoring or identity protection services for individuals impacted by the Data Breach, but the credit monitoring identity theft protection services does nothing to compensate Plaintiff and the Class Members for damages incurred, and time spent dealing with, the Data Breach.

125.    Many failures laid the groundwork for the Data Breach, starting with Defendants' failure to incur the costs necessary to implement adequate and reasonable cybersecurity training, procedures, and protocols that were

necessary to protect Plaintiff's and Class Members' PII.

126.    Defendants maintained the PII in an objectively reckless manner, making the PII vulnerable to unauthorized disclosure.

127.    Defendants knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would result if Plaintiff's and Class Members' PII were stolen, including the significant costs that would be placed on Plaintiff and the Class Members as a result of the breach.

128.    The risk of improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendants, and Defendants were on notice that failing to take necessary steps to secure Plaintiff's and Class Members' PII from that risk left the PII in a dangerous condition.

129.    Defendants disregarded the rights of Plaintiff and the Class Members by, inter alia, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their PII was protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class Members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and the Class Members with prompt and accurate notice of the Data Breach.

**CLASS ALLEGATIONS**

130.    Plaintiff brings this case individually and, pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following Nationwide Class ("Class") and California Subclass ("Subclass"):

CLASS ACTION COMPLAINT

**Nationwide Class**

All residents of the United States whose PII was compromised in the Data Breach, including all persons who received notice of the Data Breach.

**California Subclass**

All residents of California whose PII was compromised in the Data Breach, including all persons who received notice of the Data Breach.

131.   Excluded from the Class and Subclass are Defendants, their subsidiaries and affiliates, officers, directors and members of their immediate families and any entity in which Defendants has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

132.   Plaintiff reserves the right to modify or amend the definition of the proposed Class and Subclass, if necessary, before this Court determines whether certification is appropriate.

133.   The requirements of Rule 23(a)(1) are satisfied. The Class and Subclass described above are so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. As noted above, there are approximately 380,000 Class Members, and given Defendants' contention that the Data Breach affected only customers of four California locations, Plaintiff alleges on information and belief that most of the Class Members are also members of the California Subclass.

134.   The exact size of the Class and Subclass and the identities of the individual members thereof are ascertainable through Defendants' records, including, but not limited to, the information implicated in the Data Breach.

CLASS ACTION COMPLAINT

135.    The requirements of Rule 23(a)(2) are satisfied. There is a well-defined community of interest and there are common questions of fact and law affecting Class and Subclass Members. The questions of fact and law common to the Class and Subclass predominate over questions which may affect individual members and include the following:

- Whether and to what extent Defendants had a duty to secure and protect the PII of Plaintiff and the Class Members;

- Whether Defendants were negligent in collecting and disclosing Plaintiff's and Class Members' PII;

- Whether Defendants had duties not to disclose the PII of Plaintiff and the Class Members to unauthorized third parties;

- Whether Defendants took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

- Whether Defendants failed to adequately safeguard the PII of Plaintiff and the Class Members;

- Whether Defendants breached their duties to exercise reasonable care in handling Plaintiff's and Class Members' PII in the manner alleged herein, including failing to comply with industry standards;

- Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

- Whether Defendants had respective duties not to use the PII of Plaintiff and the Class Members for non-business purposes; and

- Whether Defendants adequately, promptly, and accurately informed Plaintiff and the Class Members of the Data Breach;

136.    The requirements of Rule 23(a)(3) are satisfied. Plaintiff's claims are typical of the claims of Class and Subclass Members. The claims of Plaintiff and the Class and Subclass Members are based on the same legal theories and

31

CLASS ACTION COMPLAINT

arise from the same failure by Defendants to safeguard PII. Plaintiff and the Class and Subclass Members each had their PII disclosed by Defendants to an unauthorized third party.

137.    The requirements of Rule 23(a)(4) are satisfied. Plaintiff is an adequate representative of the Class and Subclass because his interests do not conflict with the interests of the Class and Subclass Members. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of Class and Subclass Members and has no antagonist interests. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation, including data breach litigation. While the aggregate damages that may be awarded to the Class and Subclass Members are likely to be substantial, the damages suffered by the individual Class and Subclass Members are relatively small. As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class and Subclass to individually seek redress for the wrongs done to them. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and Subclass and will conserve the resources of the parties and the court system. Defendants' uniform conduct is generally applicable to the Class and Subclass as a whole, making relief appropriate with respect to each Class and Subclass Member.

138.    Here a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Damages for any individual Class Member are

likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting damages in the aggregate would go unremedied.

139.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

- Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, using, and safeguarding their PII;
- Whether Defendants' data security practices were reasonable in light of best practices recommended by data security experts;
- Whether Defendants' failure to institute adequate protective security measures amounted to negligence;
- Whether Defendants failed to take commercially reasonable steps to safeguard consumer PII; and
- Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

140.    Finally, all members of the proposed Class and Subclass are readily ascertainable. Defendants have access to the names and addresses of the Class and Subclass Members affected by the Data Breach. At least some Class and Subclass Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

///
///
///
///

33

CLASS ACTION COMPLAINT

## COUNT I

## NEGLIGENCE

(On Behalf of Plaintiff and the Class)

141. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

142. Defendants owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

143. Defendants knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class Members' PII and the importance of maintaining secure systems.

144. Defendants knew, or should have known, of the vast uptick in data breaches in recent years. Defendants had a duty to protect the PII of Plaintiff and the Class Members.

145. Given the nature of Defendants' business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Defendants should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring, which Defendants had a duty to prevent.

146. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect the PII entrusted to them—including Plaintiff's and Class Members' PII.

147. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls,

34

policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

148. But for Defendants' negligent conduct/breach of the above-described duties owed to Plaintiff and the Class Members, their PII would not have been compromised.

149. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft and medical theft, which risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation and diminution in the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

**COUNT II**

**UNJUST ENRICHMENT**

(On Behalf of Plaintiff and the Class)

150. Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

151. Plaintiff and the Class Members conferred a monetary benefit upon Defendants in the form of monies paid for products.

152. Defendants accepted or had knowledge of the benefits conferred upon it by Plaintiff and the Class Members. Defendants also benefited from the

35

receipt of Plaintiff's and the Class Members' PII.

153.   As a result of Defendants' conduct, Plaintiff and the Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and the Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

154.   Defendants should not be permitted to retain the money belonging to Plaintiff and the Class Members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and the Class Members paid for and that were otherwise mandated by federal, state, local laws, and industry standards.

155.   Defendants should be compelled to provide for the benefit of Plaintiff and the Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

156.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

157.   Defendants required Plaintiff and the Class Members to provide, or authorize the transfer of, their PII in order for Defendants to sell them products. In exchange, Defendant entered into implied contracts with Plaintiff and the Class Members in which Defendants agreed to comply with their statutory and common law duties to protect Plaintiff's and Class Members' PII and to timely notify them in the event of a data breach.

158.   Plaintiff and the Class Members would not have provided their PII to Defendants had they known that Defendants would not safeguard their PII, as

36

promised, or provide timely notice of a data breach.

159.   Plaintiff and the Class Members fully performed their obligations under their implied contracts with Defendants.

160.   Defendants breached the implied contracts by failing to safeguard Plaintiff's and the Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

161.   The losses and damages Plaintiff and the Class Members sustained (as described above) were the direct and proximate result of Defendants' breach of their implied contracts with Plaintiff and the Class Members.

## COUNT IV

## CAL. CONSUMER PRIVACY ACT

(On Behalf of Plaintiff and the Sublass)

162.   Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

163.   Defendants violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted PII of Plaintiff and the Subclass.  As a direct and proximate result, Plaintiff and the Subclass Members' unencrypted and unredacted PII was subject to unauthorized access and theft.

164.   Each Defendant is a "business" under the meaning of California Civil Code § 1798.140 because each Defendant is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civil Code § 1798.140(d).

CLASS ACTION COMPLAINT

165.    Plaintiff seeks injunctive or other equitable relief to ensure Defendants adequately safeguard PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendants continue to hold PII, including Plaintiff's and the Subclass Members' PII.  Plaintiff has an ongoing interest in ensuring that his and the Subclass Members' PII is reasonably protected, and Defendants have demonstrated a pattern of failing to adequately safeguard this information.

166.    Pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendants' registered service agents, detailing the specific provisions of the CCPA that Defendants have violated and continue to violate. If Defendants cannot cure within 30 days—and Plaintiff believes such cure is not possible under these facts and circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.  In the meantime, Plaintiff seeks actual pecuniary damages resulting from the violation.

## COUNT V

## CAL. CONFIDENTIALITY OF MEDICAL INFORMATION ACT

(On Behalf of Plaintiff and the Subclass)

167.    Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

168.    Defendants are subject to the Confidentiality of Medical Information Act, Civil Code §56 et seq., because it is a provider of health care and/or a contractor.

169.    In the course of providing or contracting with respect to health care, Defendants created, maintained, preserved, stored, abandoned, destroyed, and disposed of confidential medical information, but negligently failed to preserve the confidentiality of that information.  This information includes medical cannabis cards and information related to the diagnosis and treatment

38

of medical conditions that are treated through the use of cannabis.

170. Defendants negligently failed to take reasonable precautions to ensure its computer systems, and those of its vendors, were protected from access by unauthorized persons, which resulted in the release of confidential medical information.

171. As alleged herein, Plaintiff and the Subclass Members sustained economic loss as a result of the authorized disclosure of their confidential medical information.

172. As a result of Defendants' violations, Plaintiff and the Sublass Members are entitled to actual damages, statutory damages, punitive damages, and attorneys' fees and costs in amounts to be proved at trial.

**COUNT VI**

**CAL. UNFAIR COMPETITION LAW**

(On Behalf of Plaintiff and the Subclass)

173. Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

174. The California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, et seq. ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

175. By reason of Defendants' above-described wrongful actions, inaction, and omission, the resulting Data Breach, and the unauthorized disclosure of Plaintiff's and the Subclass Members' PII and confidential medical information, Defendants engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

176. Defendants' business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, in that the private and

39

confidential PII and medical information of consumers has been compromised for all to see, use, or otherwise exploit.

177. Defendants' practices were unlawful and in violation of the CCPA and CMIA and Defendants' own privacy policy because Defendants failed to take reasonable measures to protect Plaintiff's and the Subclass Members' PII and confidential medical information.

178. Defendants' business practices as alleged herein are fraudulent because they are likely to deceive consumers into believing that the PII and confidential medical information they provide to Defendant will remain private and secure, when in fact it was not private and secure.

179. Plaintiff and the Subclass Members suffered (and continue to suffer) injury in fact and lost money or property as a direct and proximate result of Defendants' above-described wrongful actions, inaction, and omissions including, inter alia, the unauthorized release and disclosure of their PII and confidential medical information.

180. Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff's and the Subclass Members' PII and confidential medical information also constitute "unfair" business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200 et seq., in that Defendants' conduct was substantially injurious to Plaintiff and the Subclass Members, offensive to public policy, immoral, unethical, oppressive, and unscrupulous, and the gravity of Defendant's conduct outweighs any alleged benefits attributable to such conduct.

181. But for Defendants' misrepresentations and omissions, Plaintiff and the Subclass Members would not have provided their PII and confidential medical information to Defendants, or would have insisted that their information be more securely protected.

CLASS ACTION COMPLAINT

182.   As a direct and proximate result of Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff and the Subclass Members' PII and confidential medical information, they have been injured as follows: (1) the loss of the opportunity to control how their information is used; (2) the diminution in the value and/or use of their information entrusted to Defendants; (3) the increased, imminent risk of fraud and identity theft; (4) the compromise, publication, and/or theft of their information; and (5) the costs associated with monitoring their information and guarding against identify theft.

183.   An award of attorneys' fees and costs is appropriate under California Code of Civil Procedure § 1021.5.

## PRAYER FOR RELIEF

Plaintiff, individually, and on behalf of all other members of the Class and Subclass, respectfully request that the Court enter judgment in their favor and against each Defendant as follows:

1.     Certifying the Class and Subclass as requested herein, designating Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

2.     Awarding Plaintiff and the Class and Subclass appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

3.     Awarding Plaintiff and the Class and Subclass equitable, injunctive, and declaratory relief, as may be appropriate.

4.     Awarding Plaintiff and the Class and Subclass pre-judgment and post-judgment interest to the maximum extent allowable;

5.     Awarding Plaintiff and the Class and Subclass reasonable attorneys' fees, costs, and expenses, as allowable; and

41

6.      Awarding Plaintiff and the Class and Subclass such other favorable relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated:  January 22, 2025                    Respectfully submitted,
                                            CLAPP & LAUINGER LLP

                                            _____
                                            JAMES F. CLAPP
                                            Attorneys for Plaintiff

CLASS ACTION COMPLAINT